Association, and for the American Quarter Horse, we will hear from Mr. Kelton. Thank you, Your Honor. Freed registration rules adopted by voluntary nonprofit organizations are not what the antitrust laws were designed to address, and appellees trying to squeeze them into the antitrust law has resulted in three areas I intend to talk about today. First, of course, for Section 1, you have to have concerted action, but the association spoke with one voice and with one interest. Second, the appellees have tried to restrict the market to an imprecise definition of elite quarter horses that results in boundaries that are so vague as to be meaningless and defy real-world realities. And finally, there is no injury to competition. The association did not control prices, and competition remains strong and vigorous. Let me talk briefly about concerted action. As the Court knows, the single entity rule dictates that a single entity cannot conspire with itself. That's the lesson in American Needle and Copperwell. There are two elements the plaintiffs must prove to get over that. First is that there are separate economic actors who have separate economic interests to advance. And second, equally as important, and what is missing here, is that those actors are pursuing their own separate interests rather than that of the association. Well, weren't they? No. Weren't the so-called elite breeders pursuing their own interests? No, Your Honor, and let me explain why. There are—remember, there are only five people that are considered by the appellees to be elite breeders on a committee of 30. And the issue is, of course, five couldn't control that issue, so what they say is the five control the rest of the 30. Well, that was my point. You may have five each pursuing his or her own independent interests, but five isn't—you've got to go farther than that. Yes, Your Honor, that's right. And they admit that their testimony on that about control is assumption, and they do so specifically, and additionally, the other members were polled on that, and they said, of course, they weren't controlled. There are other things they bring up, like the good old boy network. It's one thing to say it, and it has a nefarious tone to it, but it is quite another thing to prove that. They talk about a number of additional things. They say, for example, is there was a meeting behind the back of the president, and secret and a furtive type of meeting, but the truth of the matter is that didn't actually occur. They refer to Exhibit 92, which is only an email from the president, so they couldn't be conspiring behind his back, to members of the Stubbook Committee to meet with the help of that. That doesn't help them at all. They claim they're a lot like either American Needle versus the NFL, or North Texas Specialty Physicians. And let me address that legal point, because I think it can be put to rest rather easily. First thing is, and the facts are roughly the same, just change the organization. In the NFL, 32 teams combined together, each of them had their own trademarks and logos that they were going to market as souvenir uniforms and the like, and they wanted to have one manufacturer to do it. So they formed a subsidiary within the NFL to pursue that. They pursued their own separate economic interest in doing it, and they did so collectively only to one purchaser to restrain trade. Of course that made sense, but that's not us at all. There's no indication that anything like that happened. Interest in the breed registry was what drove this issue. Additionally, in that regard, it's very important to note here, there's no evidence that separate economic interests were actually pursued. If you look at page 25 to 31 of their brief, you'll see that they don't even take on this issue at all. They don't believe it is an element to overcome the single entity defense, and that's important in this case . . . What do you mean there's no evidence that they were pursuing their . . . Well, there was testimony from the members that they called to testify to reasons for their voting for the rule. There was no evidence that they pursued anything separately. Well, now in their brief, they cite some things about stud fees going down or something like that, don't they? Your Honor, they do, and they talk about that perhaps stud fees could go down, perhaps that there could be more horses in the market, but the issue is they've got to prove that issue to be able to do that, and they didn't. The other thing, remember, is on concert of action. Is it the . . . Well, actually, I mean, you don't have to . . . Actually, all you'd have to have is a few stray remarks by people that the jury can infer they're pursuing their own economic interests. Your Honor, I agree with that, and there's no doubt about that, and we were looking at a no evidence standard, and we obviously have to take that on. And at some point, it seems to me what you have to take on is that you were not able to impress Judge Robinson on this, and you weren't able to impress the jury, so it's just a harder . . . Your Honor, it does make it harder. Our point is it never should have gotten to a jury at all because of the lack of evidence on those points that we think are terribly, terribly important. Let me talk about the relevant market because I think that's the big problem in the case. The relevant market here was defined as elite quarter horses. It was described by the witness as tippity-top or the best of the best. It's narrowed to a point of absurdity. It also is so imprecise it blurs the boundaries to the point of nonexistence and is completely inconsistent with real world realities, which is independently, as Your Honor held in Doctors' Hospital, something that will destroy a class. Here's what happened. There is no . . . no one disagrees that in the total quarter horse market there is not vigorous and live competition, so they couldn't limit it there. So they eliminated, by their own testimony, 99.5 percent of the quarter horses to limit it to an elite group. And here's their theory of shortage, and this is how they got to shortage. This is what they say. Sperm taken from stallion in one taking can breed one million mares. True, by the way. A mare can only produce a few eggs a year and typically in an embryonic transfer situation can only breed or produce two or three embryos a year. Therefore they claim, and this is it, this is the shortage, their claim is there's more male reproductive material out there than female. That is the shortage. That's always the way that has been, though. I think females understand that. Yes, Your Honor. And I was excited to make this argument to a mixed court, as a matter of fact. But where's the testimony about there's a shortage in the market of mares that will give birth to successful offspring? Where's the evidence in the record that there's not, that the supply? I don't understand what you mean by that. Your Honor, they created a shortage to get out of the regular market. That's my only point, and I probably ought not to take it. You're talking about elite mares. Yes. Is that what you're talking about? Oh, I see. And why are they, why do you need an elite mare to breed a cloned horse? You don't. Okay. You absolutely don't. The idea is that perhaps you could get more doing it that way. Could you breed an elite horse with a sheep? I assume so. I assume so. A big sheep, but. Right. But here's the issue. The real problem is you can't define this class. And actually, the court's instructions just use elite quarter horse, and it's an imprecise adjective that is difficult to quantify and way too vague to be useful. Dr. Flom, who came up with it, said these things, and these are quotes from the record. It means alternatively, he said, these are synonymous. High quality, best of the best, top drawer, aspirational. Well, where is it in all this issue? Why do we define on quality of an animal? And actually, courts have shied away from defining markets based on quality. What's your, I mean, do you have, what did your expert say about all this? Did you have an expert? He says that one, yes, we did, and it was Dr. Ugon. Dr. Ugon said two things. He said, first, this is too imprecise to have a direct meaning, and second, he admits there is such a thing or as elite horses that perform better than others, but questions whether a class can be drawn on it, and equally as important, questions where this one was drawn. And let me explain that, because I think it's important. In a quarter horse, and this was, the Apley's theory was, at yearling sales, where there are a lot of yearlings sold, the real truth of the matter is, we ought to consider only 350 horses, and of that, 175 are mares, and that's pretty much their class. And you reach that decision based on price, $35,000 and up, was initially what Dr. Flom said. So, the issue is, how do those, but in the end, what he said is this, and it's fascinating. He said, all these characteristics I came up with, he actually, you're going to hear characteristics, and it was in their briefest characteristics, actually, Dr. Flom said indicators of what would happen, that the real truth of the matter is, he said, the consumers don't care about that. What they really, really care about is the situation where you have a horse that performs well, that wins races, or will be able to make money in breeding. That's what the consumer cares about. So, the question, obviously, is going to be, are horses outside his alleged elite market going to be reasonable substitutes for the ones in it? And we know there are, from undisputed historic evidence. In 2011, the top ten winning quarter horses by money in races, four came from non-elite, or would be termed by Dr. Flom, non-elite horses. Only three came from the yearling sales in his elite class. We did the same thing for 2010. We did it for all the top 42 horses in 2010 and 2011, and the statistics were roughly the same. Their answer to this is one case, and it is International Boxing Club of New York. And in that case, the United States Supreme Court said that a market was properly put in place for championship boxing bouts. Not championship boxers by quality, not champion boxers themselves, but bouts. In eight categories, there is a championship belt. There's only one champion at a time, decided by a bout that everybody knows, just like the Super Bowl. We know that the Vince Lombardi trophy is going to be on the line. It was precise. They didn't quantify the market by the quality of the boxer. If they had, that case would have been analogous, but it's not. And let me say one other thing. Wait, so the restraint was in not letting somebody into those bouts, or was this restrained in organizing such that other people couldn't organize competing bouts? Yes. It was where they couldn't organize competing bouts. They got all the venues, tied them up, and made deals so only they could. That would be more equivalent to monopolizing the racing, you know, the racetracks. That would be what it would be equivalent to, Your Honor. It would not be equivalent to the horses themselves. No court that we can find, at Appalachia site none, have ever quantified a market based on quality of an animal or a human. Finally, let me just turn briefly to no unreasonable restraint on trade, and I'm going to say two things. First off, they say, well, our horses are worthless because they don't get registration. And if they don't get registration, people don't like them. In Consolidated Metal Products, this court in 1988 said, a refusal to promote or approve that has the effect of excluding a product from the market, even when the consumers like the product or accept the approval, doesn't do it. You've got to have more. You've got to show that the agency that did that coerced. There's no evidence of coercion here. They don't even suggest that. Of course, I mean, part of their argument, I think, is that these cloned horses can't even compete in these top money races, right? Yes, Your Honor. Because they're not registered. That's right, and that's a matter of state action, and we're not claiming immunity. Don't get me wrong, but what we're saying is states do that because they value our registration. We don't encourage that. But remember, this court recently held in Marucci Sports that even if there is an exclusion for purposes of, or an exclusion of a product because of a regulation there, the NCAA took out some bats because they could cause some injury. Even if there's exclusion, that doesn't cause an injury unless you go back and look to see whether, and in that case, there was a shortage, but you even go back and look to see if there was a shortage. Thank you, Mr. Kelley. Thank you, Your Honor. Thank you. Mr. Munford. May it please the Court, for the record, my name is Luther Munford. With me at counsel, Tabler Nancy Stone from Amarillo, Texas, and Sam Stein from Cherokee, Oklahoma. We have divided our time. I would like to address liability to the extent that's convenient with the Court, and Ms. Stone       Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. I would also like to address the financing issue to the extent that that is desirable. If this is an antitrust case, I guess we ought to start with where the money is. Opposing counsel has not mentioned it. Our clients have horses which the District Court has said are for all practical purposes identical to the breed's champions, but the association will not register our horses, will not register our horses' offspring. Where the money is and where the damages were in this case, which hasn't been mentioned, is in breeding of these horses. Well, your client, the jury did exactly what your client asked them to do when he said this isn't about the money. He did say that, but they also had another argument, which is very interesting in light of opposing counsel's contentions, which is their expert said, you've put on damage of loss of breeding, loss of stud fees, and loss of sales of yearlings, but you've assumed that the prices are going to stay the same. And under our testimony, there's going to be competition in the market and the prices are going to go down. So they said our damage model wasn't any good because we relied on old prices and hadn't said what the new prices were going to be. He says no harm to competition. In the trial court, they relied on the fact that there was going to be competition to defeat our damage. I'll accept all that, but I mean, the fact is you didn't cross appeal lack of damages, right? No, we didn't. No, we didn't. And pleading 140 is the trial judge's opinion on attorney's fees and it talks about how there was injury, plenty of injury and plenty of benefit to the market and to the breed from our case, but the jury didn't award damages. Yeah, let me just ask you one practical question again. You know, your theory about money only goes so far, so I'll ask you a practical question. If this were a movie about, you know, Dolly the cloned horse or Miss Just Two or whatever the name is, why couldn't your guy just create demand for this product by buying off one of his buddies in the good old boy team? Let's have a race. Let's see who the better horse is. And you publicize it and you get a huge audience for it because your client is apparently not a poor boy. And then your horse shows his or her worth and, you know, then everybody else in Aqua says, oh, my gosh, we've just got to open our arms to these new guys or they're going to take the market away from all the old fashioned horses. That might have been an argument to the jury, but it wasn't made to the jury. This case is not about racing. It's about breeding. I understand that. That's how you show that your breed is better than their breeds. Here's the barrier to entry. You want to be in the barrier. You want to be in the barrier. No. You've got to have an elite quarter horse, okay? And in order to sell breeding rights, traditionally, in order to get in the market, the barrier to entry recognized in the economic literature is with mayors. They don't ovulate very frequently. It takes seven to ten years because you have to buy an elite mayor, you have to maybe put that mayor in competition, and you then have to prove that the offspring of that mayor will succeed and are successful. And that's the way you prove that a quarter horse is elite. They didn't mention the characteristics of elite. There are about ten of them, and they largely have to do with breeding value. Our people are a threat, and let me say breeding value is tremendous. Mr. Wise has a horse aptly named Corona Cartel. One horse breeds 88 mayors in one year at $35,000 a piece, stud fees. That's $3 million in one year from one horse for stud fees. Now, Mr. Wise may be a volunteer when he serves on these committees and makes these rules, but he's certainly got a strong financial interest. You know, I'm willing to accept all that, but getting back to the issues here, the first one that they raise is that there's no concerted action, and it seemed to me, I mean, I read through your brief, and where is the evidence that these five elite horse owners controlled a committee of 30, and then that that committee of 30 controlled the board? I mean, I just think that's a, I'd like to hear that evidence. Two things. First of all, a court, they, their brief is on this, their opening brief is worthless. They don't talk about their own witnesses. Mr. Merrill, Mr. Wise say that all 30 or 28 of the people are breeders. All eight of the members of the stud book committee who testified in this case own elite horses and are breeders. But I mean, naturally, when you're talking about the characteristics of the breed, this is an organization of a quarter, more than a quarter million people worldwide, is it not? Something, yes. Yes. And so, naturally, it stands to reason that the committee that's going to determine the characteristics of the breed is going to have more breeders on it, rather than the person who has a little, you know, weekend farm in Belleville with a registered quarter horse. So I'm not, I don't see that that in itself, that's why you've got to narrow your market, right? The, first of all, the evidence is that the stud book committee, the association has given this whole thing to the stud book committee, which is a bunch of breeders. If it doesn't get out of the stud book committee, it doesn't even go to anybody else. And they successfully killed it through sham procedures for four years. The evidence on the, on the not going to the board of directors is... What evidence do you have? I mean, how, did you have evidence about every one of those 30 members conspiring or a majority or a voting majority conspiring? There are two issues. Number one, do they have independent economic interest? I believe we've established that. Well, let's assume, let's say that's a possibility, but you're defining an elite market, and that's only at most five members out of a 30 member committee. I mean, the rest of them may be ranchers, for all I know. Your Honor, Carol Rose, who testified, is the lead breeder of performance horses. Mike Jennings owns Mike Glass Capture. He breeds 150 mares a year. Joan Schroeder breeds pleasure horses. Not all of them are elite, but she owns a horse named Blazing Hot, who's an elite horse. Dwayne Walker has registered 1,700 horses with the AQHA. All of these people are on that committee. We have an octopus diagram in the record excerpts showing 16. Your client says that he's being excluded from registration, but his damages have to do with the elite market, the elite sub-market. And therefore, I had the misimpression, perhaps, that the restraint of trade had to be tied to an elite sub-market. Is that wrong? We can't get in the market at all. I know you can't get in the market at all. But if the market is everybody from kingdom come, then you can breed just as well as they can, whether you're registered or not, and if you've got a superior product, I don't see how you're excluded from buying a mare and letting her carry your cloned product to term. That does bring in the issue of state regulation. But just answer me this, Mr. Munford, to prove this is not a per se violation, it's a violation of the rule of reason. You have to have a product market. Your product market was the market for elite quarter horses. And more particularly, the breeding of elite horses, stud fees and yearlings. And by your definition, my understanding, at least this is the way I read your brief, you were focusing on these five big bad guys, the good old boys, who were members off and on, not all of them all at the same time even perhaps, off and on for several years of the 30-member committee. So you've got four members of a 30-member committee. I would call your attention to Exhibit P147, which is the Oxford chart. It's in record excerpts. It talks about 16 people, all of whom are tied to heritage place auctions. And I would also call your attention to the testimony of Mr. Merrill and Mr. Wise as to all 30, or almost all 30, of the people being breeders. And there are denials that they're not, occasionally that they're not all elite breeders, but every one of them who testified has an elite horse and breeds it, eight of them. Could you please explain to me the conspiracy theory? I mean, it just seemed to me that the association members are, you know, are somewhat aligned. I mean, they're not competitors of the association. The interest may very well be the same as the association. So how do you get this conspiracy between the association and the members? The test of the American needle is whether they have an independent economic interest. The interrogatory to the jury was, do they have an economic interest separate from that of the firm itself? The Quarter Horse Association's interest is in having more members, more horses registering horses. But they're not competitors with the association, but the Quarter Horse Association is not a competitor of the association members, is that right? No, it's like Justice Stephen talks about in American Needle. The association is being used by people who are competitors of the plaintiff to pursue their own individual interests, which are not the interests of the association. I would cite the court not only to American Needle, but to the Hydra level case where a standard setting organization was used by two employees of competitors. I would cite the court to Allied Tube, which is a case, a Supreme Court case, where they said that the process had been biased by members. And American Needle and North Texas say the test is who controls. And the jury could find that they control. So what you're saying is that you have a bunch of breeders, and you're saying that in this organization with a quarter million people, there's going to be the whole 99.9% of the range of quarter horses from nags and old ones on their way to the glue shop to the elite crowd, right? And naturally, it's not, I mean, this is probably true in the Poodle Association, and that's why we have an amicus brief from seven different other horse associations that the breeders are in there, too, you know? Yeah, exactly. So, you know, all of those are vulnerable. Every time they make a change in their breed, I mean, suppose this change was, as it was a few years ago, we don't want so much white on the, you know, on the snout of the horse. That's a very important question. Because any of that excludes somebody, right? And anybody can make exactly the argument that you're making. Okay, wonderful question, but I don't draw that conclusion. These associations have the authority to define the breed. They can define what a quarter horse is, and for example, with the white rule, if they have a white rule, and there's one horse out there who doesn't get registered because of the white rule, there's no effect on competition. Let me say, don't, if you, there's a lot of questions that we all have here, and answer the questions, and don't worry, we'll give you a little time to make an additional argument if you miss some of the points you want to make. So everybody can just relax a little bit and not worry about not making your points ultimately. As I said, the market is the market for elite quarter horses, but in particular with our damage model, for stud fees and yearlings that would have been yielded. Now, under the jury instructions and the law, the first thing you do is you look for inelasticity of demand, and is demand responsive to price? And we have put before the court, both in record excerpts and a few additional pages, some material from P92, which is our expert's report, and if I can give the court any citations, it would be 2841, 3275, and exhibit P89, page 31. What those pages say is that the number of elite horses, elite quarter horses, is very small. One witness says, well, Mr. Laughlin, when he asked the question, said, you're talking about 100, not 200, you're talking about hundreds, not thousands, right? The witness says yes. Another witness has asked, how many elite mayors are there? He says, well, there are 50 blue hens, they call them, and a few hundred that are good. The Quarter Horses Association itself identifies 45 stallions that breed more than 100 a year, which is another criterion of breeding values. For whom, from the point of view of stallions or mayors, I don't understand. It's considered, if a stallion is bred to more than 100 mayors a year, and of course all of this is artificial, they haven't used traditional methods in many years, then that's one of our experts' characteristics as elite, but the Association itself keeps those statistics, how many stallions breed that much. The Association itself publishes lists of horses by the value of their offspring. How did their offspring do in racing? They publish those lists, that's one of our criterias of elite. They know who these horses are, there's no denial that the horses we named in this testimony were elite. Now, let's go to the market. The market. This is something I haven't seen in any case. This is a chart of any elasticity of demand, which is what tells you whether there's a separate market or not. This is a chart for yearlings. That was one of our damage figures. And what it shows is that the demand for the horses is very sensitive to price for the first 95% or so. And then at the top, it's very inelastic. And their expert, which is the test for a separate market, you're not going to, increasing these kind of horses is not going to change the price of people. And their expert, Mr. Dugone, says this chart is right. He testifies there is a market for elite quarter horses. Our expert said that if you want to pick a point where it churns, it's about $35,000, which is the top 5% of these yearlings, and it's a selected group of yearlings. Let's assume that's the market. I'm sorry? I'm willing to assume that's the market. Okay. Although, you know, again, as he said, do you have a single case where animals or humans have ever been held to be a sub-market? Never held to have a case where they weren't. I know. I get it. You know. No, no. It's more important to have precedent than to have no precedent. You need to know that. Okay. But aside from that, if that's the relevant market, then you have to show that the conspirators who are in the relevant market were the ones who excluded you from that market. And this record is full of that evidence because these people set up this sham procedure through which they . . . You know, I know it's easy to dramatize before a jury. Add two minutes more to each side. But, again, you know, you've got to assume there are probably some breeders in that that don't breed elite quarter horses in that . . . I mean . . . And, therefore, it gets back to . . . It's like, let's say you have an association of steel manufacturers and you've got a group of them within the standard-setting business, and a few of them produce the most high-test specialty steel in the world, and they define their product in certain ways, but they don't control the standards committee because they don't have the votes. That brings in consolidated metal, which is helpful. And footnote 21 of consolidated metal notices in that court that in that case the standards were not a matter of law, as they were in hydro level, and as they are in this case. They, in their brief, have listed all the state statutes that give them market power. Furthermore, in the consolidated metal case, at page 295, the court specifically noted that the committee was composed of users, not competitors. One final word about international boxing, which we believe is very much on point in this case, as well as the other price cases—Whole Foods Market, Geneva, Linux, and so forth. Here's the analogy. You have an elite quarter horse. There is a market for stud fees and for yearlings. And then those yearlings go out in the world and do whatever they do, okay? We say that the market for stud fees and yearlings is inelastic, and we have shown an elite market of a few hundred horses, and they are threatened by the fact that, for example, 300 horses have been gene banked for possible future cloning. In the international boxing case, what was the measure that the court looked to to define the market? It was not the prices paid to the competitors, just like we're not talking about the prices the horses so much. It was the prices paid for the tickets to the competition, just like we're talking about the prices paid for the breeding rights to these horses. It did not matter whether the fight ended up being a good one or not. The market was defined by the ticket price, and in this case, the market is defined by the price of the breeding rights and stud fees, and even if some of those horses don't go off and win races, it doesn't matter. That is part of the barrier to entry that we want to break down. We do not want to race these horses, we want to breed them. Nobody's preventing you from breeding them. But we can't register them. You can breed them all you want, and you can create your own market, because somebody, I mean, the only way, in other words, the only way they prove themselves is if they race and win a bunch of money, ultimately, right? They can't race. They can't race. Of course they can race. You put them on a racetrack and you race them. You can breed five or six of them and you can race them and see what happens. Judge Jones' state law says we can't race them. What law says? That doesn't mean you're foreclosed from every state track in the country, does it? If you look at the list in their brief, it says we can't race these horses because they're not registered with the Quarter Horse Association. And in Hatley, if I may close with just a reference to precedent, in Hatley, this court said, this court said, that without registration, these horses are virtually worthless. Without registration, an American Quarter Horse is virtually worthless. This court said this test was, did the people who made the decision have an independent economic interest, independent stake in the illegal acts? We proved that. It said that in this case, they were acting in the best interest of the association. We proved that their justifications were shams. They did have the secret meeting. The people were called to meet with the executive committee. What's that email that, I mean, is he right about that that's not even? No, he's not right about that. Well, what's your citation then? I'll just call your attention to look at Mr. Veniklason, page 2811 to 2825, and Mr. Treadway, 2971. They called the opponents that were supposed to meet, and I'll try to be concise. They called, they were supposed to meet in spring of 2012. They called, they had sent an email saying the opponents of cloning were supposed to come meet with the executive committee in January. After that meeting, the president tells our people, you've got a chance here. And we believe that he was sincere and believed that. And a member of the staff calls our people up and says, you don't have a chance. All right, bring it to a close, bring it to a close. And from that evidence, the jury could conclude, it is evidence upon which a jury could conclude that they met secretly and rigged the meeting. Even though they have five votes and the committee has 30 votes? Yes. Okay. Okay, we will hear from Ms. Stone now. Is that right? Ms. Stone next. That's the way I've got it, is that correct? You look exasperated or something. Is that not the way it is supposed to be? No, Your Honor. I think it's pretty hard. Yeah, okay. May it please the court. My name is Nancy Stone. I have represented Abraham and Wendell Clausen Joint Venture since the time that the complaint in this case was filed. As Judge Joan acknowledged, AQHA was neither able to convince the jury in this case, nor Judge Robinson, about those things that they complain about today. Again, this is a case in which there was factually and legally sufficient evidence to support the verdict of a properly-         I'm sorry, Your Honor. I'm sorry, Your Honor. I'm sorry, Your Honor. I'm sorry, Your Honor. You are not going to split it in this argument? Pardon me? How are you splitting it in this argument? I'm addressing the injunction. Okay. Okay. We also represent different clients. Beg your pardon? We also represent different clients. Okay. Okay. Move it on. Judge Robinson did not abuse her discretion in entering an injunction following the verdict of a properly-instructed jury that made its decision based on legally and factually sufficient evidence. In the exercise of her discretion in connection with granting the injunction, Judge Robinson held an evidentiary hearing on plaintiff's request for a permanent injunction. At the injunction hearing itself, it became more obvious that there was a need for the court to enter specific orders with regard to rules that needed to be revised because even after we had successfully tried the case to a jury who had denied all of or had not bought all of the justifications that AQHA brought forward, AQHA, still at the injunction hearing, was trying to assert that the judge should limit the injunction only to mayors, that there should be discriminatory rules and regulations on clones and their offspring, that there weren't on other horses. And again, those were the justifications that the jury had already objected to or had rejected. At the conclusion of the hearing, when Judge Robinson announced that she was going to enter an injunction requiring AQHA to register clones and their offspring, she requested that AQHA give some input into the language of the order, specifically stating that by doing so, they would not have waived any of their objections on appeal or in connection with any objections that they subsequently made in the trial court to the injunction that would be entered. They chose to do nothing. Two days after the hearing on the injunction, she entered an order. This is document number 136, record on appeal, number 2049. She entered an order specifically requiring AQHA to address each specific proposed change in the rules and regulations and state the requested alternative change to the rules. In response, again, AQHA did nothing. They failed and refused to point out even one problem, one omission, or one conflict in the proposed rules with those that were already in existence. The injunction that was actually entered was narrowly tailored to address the violations found by the jury and also found by the district court and to require AQHA to make revisions to 12 of its existing rules. Those 12 rules had been repeatedly identified by AQHA as being rules that had to be changed in order to accomplish registration of clones. In other words, just abolishing Rule 227A would not result in clones and their offspring being registered. On three different occasions, AQHA had identified 12 specific rules that would also need to be changed. Therefore, when Judge Robinson entered the injunction in this case, she did just that. She set forth specific and, for the most part, minor changes that needed to be made to many of the rules to provide for the registration of these horses. She exercised her discretion in entering the injunction and ordering revisions to the very rules that AQHA identified would have to be revised to register clones and their offspring. How many clones are in existence at the present time, cloned animals? As of the time of trial, there were 25 cloned quarter horses. There are then also— Who were the mares that brought them to term? Recipient mares. All quarter horses, all elite quarter horses, whether they are born through cloning procedure or any other advanced breeding techniques, are all carried by recipient mares. So it doesn't matter who the mare is? Well, it does if you're breeding a stallion to a— Right. But if you're cloning, whatever horse you're cloning, once you have an embryo, you will put that embryo in a recipient mare, and the recipient mare, which is a surrogate mother, will actually carry that baby to birth, which has been done by AQHA since sometime in the 80s. I don't know the exact date. This may be a silly question, but explain to me why people are cloning these horses if the problem is, as far as you're concerned, they can't be registered by the American Quarter Horse Association? Well, at the time that cloning first began— and there was plenty of evidence at trial about the history of accepted breeding techniques by AQHA. And one of them, multiple embryo transfer, was only allowed by AQHA after a lawsuit was filed. So, and furthermore, our clients in this case, by the president of AQHA, were encouraged that, in fact, this rule might be changed. And so it wasn't until after the June behind-closed-door secret serendipitous meeting took place, then it was taken out from under them. But up until that point in time, they were hopeful. They had every reason to believe that the rule would be changed to allow for these horses to be registered. Horses are registered with such advanced breeding techniques now that they freeze embryos, they have been freezing semen for a long time. So, and they're also produced through a procedure, ICSI, which is performed in the same laboratory. And if you weren't a scientist, you wouldn't be able to tell the difference between ICSI procedure and the cloning procedure. So why didn't they exclude the ICSI or ITSI breed? The evidence at trial was that the reason it wasn't excluded is because it was being advocated by one of the members of the Stud Book and Registration Committee, Vaughn Cook, who has shown— Well, let me just ask, doesn't one of either Abraham or Cook, your client, also breed elite animals? I'm sorry? I thought one of the two plaintiffs in this case bred elite quarter horses as well as invested in clones. No, they have no—the testimony was that neither one of them had any elite quarter horses except the clones in their offspring, which they are unable to— I mean, you know, it's fine to have a lawsuit, but I just have one other practical question. Why—your clients are both well-heeled, evidently, and to support this cloning enterprise, and why couldn't they just buy an elite quarter horse and go into the breeding business and then get on the committee? As Jason Abraham testified, there weren't any for sale. That the horses that are in the truly elite market, the sale of those horses are few and far between. That was the testimony that Jason Abraham gave. Well, how do you know your guys would get into that market then? Well, they'll get into it if this court affirms the judgment of the lower court, because the horses that they have right now, their clones and their offspring are elite but for the refusal of AQHA to register them. Lisa, that's what—that's your argument, and you're sticking to it? That's my argument. I'm sticking to it. The jury believed it, and so did Judge Robinson. Okay. Thank you. Consistent with— I believe you've run out of time. Can you finish up in about a minute, please? Yes, Your Honor. Give the side one minute. Consistent with past president and longtime Studbook and Registration Committee member Frank Merrill's pronouncement that no judge, no court would tell AQHA what to do, AQHA has continued to be adamantine, just as was recognized by this court in Hatley. As Mr. Munford referred to, the evidence revealed that there were sham procedures to up its defenses that it identified as red herrings and dead ends and feigned fairness in anticipation of a lawsuit. The specific injunction entered by Judge Robinson was warranted and necessary to prevent the power brokers on the Studbook and Registration Committee, in conjunction with AQHA, from continuing to exclude horses from the elite quarter horse market. Thank you, Ms. Stone. Mr. Keltner, we will hear from you in rebuttal. Thank you, Your Honor. Got a lot to cover, so I'm going to try to do it quickly in the time allotted. First thing, let me deal with a couple of legal points because they're important. Mr. Munford referred to the Hydroville versus ASME case, American Society of Mechanical Engineers, from the United States Supreme Court. It does not deal with concerted action. Look at the case carefully, please. It deals with the issue of whether an agent . . . in that case, concerted action was not challenged. A competitor had an agent or had a conspirator inside the organization and wrote the rule and it was discovered later. The only question the Supreme Court considered is whether agency law applied to antitrust law, so it doesn't support his position. On the issue of conspiracy, please consider this as well. You've got to have separate economic interests that are pursued. Their testimony from their witnesses are the Board of Directors was against cloning. Studbook Registry was against cloning. Our members polled, 86 percent were against. Everybody was consistent. The important thing . . . Who's your members? Your Honor? Who are your members? The members . . . in fact, it's interesting. We did a statistical survey of 3,000. 1,000 responded. They were picked at random. Ironically, what the Appalachia chain claimed is it wasn't a good study because they weren't breeders. Exactly contrary to the argument they make now. Let me turn to the breeder argument. Mr. Mumford is right in one thing but quite wrong in another. The testimony . . . there was testimony from his clients that all of the Studbook Registry people were breeders, but in his brief, he tells you that only five were involved in the elite market and that's precisely right. That's what his brief says and that is the case. Now, as to the Studbook Registry Committee absolutely controlling everything, that is not true. The Studbook Registry Committee is a standing committee in the organization. It works in conjunction with and reports to the Board of Directors. It makes reports to the annual meeting and at the annual meeting, the membership hears what their recommendations are. But the Board of Directors has a chance to pass on any recommendations and determine either affirmative or negative votes on that. Only the Board of Directors can speak for the organization and that is the bylaws. Now, the other issue on that I think is . . . sorry, I'm getting off just one thing here. Can the five control the 30 and is there testimony? Is there opportunity? I guess there may be. Is there testimony? No. The only testimony they have is that one of their clients said, yeah, I think they control it. And then on cross-examination said, do you know or are you speculating? And he admitted it was conjecture. Stubbook Registry people were called. The ones that called said there was no intimidation or anything else. On the secret meeting, I stand by what I said and I ask you to look at their brief and what they refer to because it's PX 92. And in PX 92 is an email from the President inviting Stubbook Registry people to attend. As to the stay, we did not open on that and chose not to address it, but I'll address, I mean, excuse me, not the stay, the injunction. We got a stay of that injunction pending this appeal. And that I think is the important thing. It's important to note that what happened here . . . By the district court, right? Your Honor, yes. Yes, absolutely. And the suggestion in the briefs that we drafted actually the very rules the court adopted in the injunctions not true. They were drafted by Mr. Hawley who was representing some people who wanted cloning. They were looked at us because we did what a normal organization would do. We decided we'll take a look, see what these things look like so they can be discussed and studies done. We get criticized, interestingly, unfairly on the injunction part of having participated and agreed to look through the issue of cloning and decide. Ms. Stone talked about one other thing that, again, did not come up in the rest of the arguments and certainly didn't come up in the opening discussions. And that was the issue of advanced breeding techniques. Yes, there are a lot of them. And there are a lot that have been approved. There are a lot that people on that side have actually sued over to get approved. But the truth of the matter is the difference between cloning and the difference between those techniques is cloning is a creation, only a creation. Everything else that we have approved is breeding with a sperm and an egg that has an opportunity to advance the breed. Of course, cloning duplicates what we have. And I think that issue is important. As to justification and weighing the benefit, if you will, between us not voting down the rule on cloning and anti-competitive intent, one thing, and it'll be what I close with. There are good reasons that this organization voted down the suggestion that we redo our rules to admit clones. One of the things we've been able to do over a long period of time, but in recent years, is use scientific DNA evidence to be able to positively identify any horse if their parentage, going back to Cyrus and Dan some generations, are ever questioned. That way we take human frailty out of the market. Fraud, deception, simple mistake. We're able, and that's part of the integrity of our breed registry. That can't be done in some horses in cloning. For stallions, that will not be available. Their suggestion is, well, you do it anyway for twins. You can be seated. And, uh, Sheriff? Beg your pardon? What? He said it's outside the scope of rebuttal. Okay, okay, okay. Your Honor, I, very briefly. Um, no, I thank you. If you're going outside the scope of rebuttal, if you believe I am, then I will sit down.  Thank you, sir. Okay, thank you. That, uh.